**FEDERAL ELECTION COMMISSION, Plaintiff,**

v.

**SAILORS' UNION OF THE PACIFIC POLITICAL FUND, et al., Defendants.**

**No. C–84–7763–WWS.**

United States District Court, N.D. California.

Jan. 3, 1986.

Robert W. Bonham, III, Office of the Gen. Counsel, Federal Election Com'n, Washington, D.C., for plaintiff.

Fred H. Altshuler, Altshuler & Berzon, San Francisco, Cal., for Seafarers' Political Activity Donation.

John F. Henning, Henning, Walsh & Ritchie, San Francisco, Cal., for Sailors' Union & Marine Firemen's Union.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

This is an action for declaratory, injunctive and other relief brought by the Federal Election Commission ("FEC") against three political action committees ("PACs"), each of which is connected with a different labor organization. The issue is whether the FEC properly can treat these three PACs as related organizations whose campaign contributions must be aggregated for the purpose of determining compliance with the limitation on such contributions in the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. § 431 *et seq.* ("FECA" or "Act").

Defendant Seafarers' Political Activity Donation ("SPAD") is a multicandidate PAC established by the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District ("SIUAG"). Defendant Marine Firemen's Union Political Action Fund ("Firemen's Fund") is a multicandidate PAC established by the Marine Firemen's Union ("MFU"). Defendant Sailors' Union of the Pacific Political Fund ("Sailors' Fund") is a multicandidate PAC established by the Sailors' Union of the Pacific ("SUP"). Each of the connected labor organizations of each defendant PAC—*i.e.* SIUAG, SUP and MFU—is a member of the Seafarers International Union of North America ("Seafarers").[1]

Section 441a(a)(2)(A) prohibits a multicandidate PAC from contributing more than $5,000 to any particular candidate for federal office. Section 441a(a)(5) further specifies that contributions made by PACs connected with organizations having a certain relationship to each other must be aggregated for the purpose of determining whether this $5,000 limit has been exceeded. This provision states, in relevant part:

> For purposes of the limitations provided by ... [2 U.S.C. § 441a(a)(2) ], all contributions made by political committees established or financed or maintained or controlled by any corporation, labor organization, or any other person, including any parent, subsidiary, branch, division, department, or local unit of such corporation, labor organization, or any other person, or by any other group of such persons, shall be considered to have been made by a single political committee ...

> In any case in which a corporation and any of its subsidiaries, branches, divisions, departments or local units, or a labor organization and any of its subsidiaries, branches, divisions, departments or local units establish or finance or maintain or control more than one separate segregated fund, all such separate segregated funds shall be treated as a single separate segregated fund for purposes of the limitations provided by [2 U.S.C. § 441a(a)(2) ].

On May 6, 1981, SPAD contributed $5,000 to the Brown for U.S. Senate Committee ("Brown Committee"), the authorized principal campaign committee of Governor Edmund G. (Jerry) Brown, Jr., during the 1982 Democratic primary election for U.S. Senator from California. On June 24,

---

1. FECA prohibits labor unions and corporations from directly making contributions or expenditures in connection with certain federal elections, 2 U.S.C. § 441b(a), but it permits unions and corporations indirectly to make such contributions or expenditures through "separate segregated funds", 2 U.S.C. § 431(4), or PACs. A "multicandidate political committee" is a political committee that has received contributions from more than 50 persons and that has made contributions to 5 or more candidates for federal office. 2 U.S.C. § 441a(a)(4). The labor union or corporation that establishes a political committee is described by FECA as its "connected organization." 2 U.S.C. § 431(7).

1981, on its own behalf and without consulting with Seafarers, SPAD or SIUAG, the Sailors' Fund contributed $500 to the Brown Committee. On October 31, 1981, on its own behalf and without consulting with Seafarers, SPAD or SIUAG, the Firemen's Fund contributed $500 to the Brown Committee. On March 9, 1982, under similar circumstances, the Firemen's Fund contributed $750 to the Brown Committee. On March 11, under similar circumstances, the Sailors' Fund contributed $750 to the Brown Committee.

Acting on a complaint filed by Representative Robert K. Dornan (R–Calif.), the FEC found reason to believe that defendants had violated § 441a(a)(2)(A), and initiated an investigation. Following administrative proceedings, the FEC brought this action for a declaratory judgment that defendants had violated the Act, for civil penalties, and for an injunction against future violations. As the material facts are not in dispute, all parties have moved for summary judgment.

The FEC contends that the defendant PACs are all controlled by a single labor organization within the meaning of § 441a(a)(5), i.e., Seafarers. In the alternative, the FEC argues that each of the three unions that control the defendants is a division, department or local unit of a single labor organization within the meaning of § 441a(a)(5). On either ground, it contends, the contributions made by defendants must be treated as having been made by a single political committee.

Defendants contend that they are not commonly controlled organizations whose contributions may be aggregated, and that the unions' independent histories, structures and management demonstrate that none of them is a division, department or local unit of the same labor organization.

## The Anti-Proliferation Amendments

Congress passed the Act in 1971 to limit the actuality and appearance of corruption resulting from large individual financial contributions. *See Buckley v. Valeo*, 424 U.S. 1, 26, 96 S.Ct. 612, 638, 46 L.Ed.2d 659

(1976). The Act imposed limits on the amount of money any person or group may contribute to any one political candidate, party, or committee. *See* § 441a(a)(1), (2) & (3). Because the Act did not limit the number of political committees any person or group could establish, however, the contribution limits could be evaded by having each of a number of political committees contribute the statutory maximum. To close this loophole, Congress in 1976 adopted Section 441a(a)(5), known as the "antiproliferation amendment," which requires contributions by political committees under common control to be aggregated. *See* House Conference Report No. 94–1057, reprinted in 1976 U.S.Code Cong. & Admin. News, 94th Cong., 2d Sess., 929, at 973.

Under the antiproliferation amendment, contributions made by separate political committees such as defendants are treated as having been made by a single political committee if they meet either of the following two tests: First, if they are "established or financed or maintained or controlled" by the same person or group of persons; or second, if they are "divisions, departments or local units" of a single labor organization.

### 1. *The Control Test*

The FEC argues, first, that the defendant committees are controlled by Seafarers. It relies on its regulations, which provide that indicia of control include

(B) Provisions of bylaws, constitutions or other documents by which one entity has the authority, power or ability to direct another entity; 11 CFR § 100.-5(g)(ii).

In support of its argument, the FEC points to the provisions of the Seafarers' constitution that (i) require its members to abide by it, (ii) empower it to appoint a custodian to take possession of a member's assets when its dues are in arrears, and (iii) permit it to conduct non-binding grievance procedures involving its members.

The Commission's argument, however, misses the mark. Seafarers is an associa-

tion of independent unions, none of which was created by Seafarers. Member unions may affiliate and disaffiliate with Seafarers at will. Other than having power to collect dues, Seafarers has no power over the affairs of its member unions. It has no power to adjudicate disputes among them. It has no control over the position taken by them on legislative or political issues or candidates and, in fact, its positions have at times been opposed by its members.

In sum, the relevant indicia establish the autonomy of Seafarers' member unions. The constitution embodies the rules that govern the relationship of these unions and those rules preserve their independence, a fact confirmed by the undisputed evidence of their past conduct.

### 2. *The Division, Department or Local Unit Test*

Alternatively, the FEC argues that regardless of whether actual control is established, the defendants' contributions must be aggregated because they were made by labor organizations that are divisions, departments or local units of Seafarers. It contends that labor organizations that are a part of an international union must be treated as affiliated for purposes of § 441a(a)(5) regardless of the internal organization scheme adopted.

As discussed in the preceding section, the Seafarers' constitution preserves the essential elements of autonomy of its members. Nothing in it suggests a relationship making its members divisions, departments or local units. The relationship it creates differs fundamentally from that between an international union and its locals, which are its subordinate creatures and operate under its control. The distinction is illustrated by the statement of Representative Wayne Hays, Chairman of the House Administration Committee, who, in introducing the proposal that would become 2 U.S.C. § 441a(a)(5), emphasized that the aggregation requirement of that provision would not apply to members of a voluntary association such as the AFL–CIO:

.... [A]n international union can set up a PAC and all of its local unions, state unions, etc., would be treated as a single political committee.... Then the AFL–CIO *which is a voluntary conglomerate* and all its state and central bodies should be treated as a single political committee and they could give up to $5,000 in any fragments they wanted to....

[Transcript of Hearings Before the Committee on House Administration, March 8, 1976 at 43] (emphasis added).

Consistent with that statement, the FEC has never aggregated contributions made by committees of the AFL–CIO with those of committees of its member unions. The relation between Seafarers and its members is more nearly analogous to that between the AFL–CIO and its members than to that between international and local unions.

The decision in *Walther v. FEC*, 468 F.Supp. 1235 (D.D.C.1979), has no bearing on the issue before this Court. In that case, Judge Richey simply denied the FEC's motion to dismiss a complaint under the Act, rejecting the FEC's argument that contributions by the AFL–CIO's committee could never be aggregated with those of one of its member unions. The opinion seems to imply that even if per se aggregation based on the division, department or local unit language were inappropriate, aggregation would be proper if actual control were proved.

For the reasons stated, the Court finds and concludes on undisputed facts that the FEC has failed to show that defendants, as committees established by voluntary members of Seafarers, are divisions, departments or local units of or are otherwise controlled by Seafarers. In reaching that conclusion the Court is mindful of the Supreme Court's assessment of the Act as a restriction upon rights protected by the First Amendment:

A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues dis-

cussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech. *Buckley v. Valeo,* 424 U.S. 1, 19, 96 S.Ct. 612, 635, 46 L.Ed.2d 659 (1976). An interpretation of the Act under which contributions independently made by voluntarily associated labor organizations are aggregated, thereby severely restricting the exercise of first amendment rights, would raise serious constitutional questions. Such an interpretation should be avoided if possible. *Machinists v. Street,* 367 U.S. 740, 749–50, 81 S.Ct. 1784, 1790, 6 L.Ed.2d 1141 (1961); *Murray v. The Charming Betsy,* 6 U.S. (2 Cranch) 64, 2 L.Ed. 208 (1804).

Accordingly, defendants' motion for summary judgment is granted and plaintiff's motion is denied.

IT IS SO ORDERED.